AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Apple Inc.
One Apple Park Way, Cupertino, CA 95014
Re: Account ID poostkd87@aol.com

Case No. '22 MJ0243

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein.

located in the Northern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC sec. 841(a), 841(b) | Distribution of Controlled Substance Resulting in Death, Distribution of Controlled Substance |
| 21 USC secs. 841(a), 846 | Conspiracy to Distribute Controlled Substance |

The application is based on these facts:

See Attached Affidavit of DEA Task Force Officer Jacob Wisler, incorporated herein by reference.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Task Force Officer Jacob Wisler, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ________ *(specify reliable electronic means)*.

Date: Jan. 21, 2022

*Judge's signature*

City and state: San Diego, CA

Hon. Daniel E. Butcher, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF WARRANT FOR ICLOUD ACCOUNT**

I, Jacob Wisler, Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), having been duly sworn, hereby state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application for a search warrant in furtherance of a narcotics trafficking investigation conducted by the DEA for Apple, Inc. as described in Attachment A, to search for the Apple account associated with the following:

Account ID: poostkd87@aol.com
Account Holder: Sarah FUZZELL
Account Number: (760) 402-1142
(The "Target Account")

2. On December 29, 2021, the TFO associated with this investigation served a Request for Preservation of Records pursuant to 18 U.S.C. § 2703(f) on Apple to preserve the Target Account pending further legal process. On December 30, 2021, Apple confirmed receipt of the preservation request.

3. The Target Account is linked to Sarah FUZZELL, whom investigators believe is in possession of information relevant to an ongoing prosecution of two individuals— Cole SALAZAR and Valerie ADDISON — for various charges including distribution of fentanyl resulting in death, possession with intent to distribute fentanyl, heroin and methamphetamine, and conspiracy to distribute fentanyl. It is believed that the Target Account contains data and information evidencing communications by SALAZAR in furtherance of his drug-trafficking activities.

4. Based on my experience and training, and all the facts and opinions set forth in this affidavit, I submit this affidavit in support of the application to search the Target Account for, and to seize, as they pertain to violations of Title 21, United States Code, Sections 841(a), 841(b), and 846—Distribution of Fentanyl Resulting in Death, Possession

with Intent to Distribute Fentanyl, Heroin and Methamphetamine, and Conspiracy to Distribute Fentanyl, all communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data (and all other documents and records as more fully set forth in Attachment B):

a. tending to indicate efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

b. tending to identify other facilities, storage devices, or services – such as e-mail addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

d. tending to identify travel to or presence at locations involved in efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

e. tending to identify the user of, or persons with control over or access to, the Target Account;

f. tending to identify means and sources of payment for services (including any credit card or bank account numbers or digital money transfer account information); or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

**EXPERIENCE AND TRAINING**

5. I am a peace officer employed as a District Attorney Investigator (DAI) by the San Diego County District Attorney's Office, Bureau of Investigation and have held

such employment since September 2019. I am assigned to the Major Narcotics Division. During this time, I have primarily investigated cases involving the trafficking of controlled substances such as heroin, cocaine, methamphetamine, and fentanyl. I have directed and participated in hundreds of drug investigations regarding the illegal acquisition and/or distribution of controlled drugs and effected or participated in more than 500 arrests for violations of the California Health & Safety Code and Title 21 of the United States Code.

6. Prior to my employment as a DAI, I was employed as a peace officer with the La Mesa Police Department (LMPD) from January 2007 until September 2019. While at the LMPD, I worked as a patrol officer for two years. I was a detective assigned to the Special Investigations Unit (SIU) for over four years. I was assigned as a gang investigator and federally cross-sworn Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), East County Regional Gang Task Force (ECRGTF) for four years. I was also assigned as a TFO with DEA NTF Team 2 for approximately three years.

7. I have conducted investigations involving residences that have been identified as dealing in narcotics including fentanyl and have been present during the surveillance of these residences that have been identified as dealing in narcotics including fentanyl. I am familiar with the patterns associated with the trafficking of narcotics including fentanyl as practiced locally. I have become familiar with narcotics slang and jargon as it pertains to the sales and transportation of narcotics including fentanyl. I have been involved in over 500 arrests for person involved in possession of drugs for sale, and 500 arrests of persons for the possession of controlled substances, including fentanyl. I have testified as a narcotics sales expert over 15 times in Superior Court in the County of San Diego.

8. I am also a duly appointed Task Force Officer (TFO) of the Drug Enforcement Administration (DEA), currently assigned to the DEA San Diego Field Division (SDFD), San Diego, California. I have been assigned as a DEA TFO since 2017. As a TFO, I am

authorized to swear out complaints and search warrants for violations of federal law, including violations of Title 21 of the United States Code.

9. I am currently assigned to DEA SDFD's San Diego County Integrated Narcotic Task Force (NTF) Team 10 and have been since March 2020. NTF Team 10 is comprised of DEA Special Agents (SAs), Task Force Agents (TFAs) from Federal Bureau of Investigation and Department of Homeland Security – Homeland Security Investigations, and Task Force Officers from San Diego Police Department and Department of Health Care Services. NTF Team 10 primarily investigates illegal drug trafficking organizations operating in the United States and internationally, including those DTOs whose operations involve the distribution of wholesale quantities of fentanyl, oxycodone, hydrocodone, alprazolam, other controlled pharmaceutical drugs, cocaine, methamphetamine, marijuana, heroin and hashish in and around the San Diego, California area. The primary focus of NTF Team 10 is the investigation of fatal drug overdoses.

10. I am familiar with narcotic controlled substances, including heroin, methamphetamine, cocaine, marijuana, fentanyl and prescription pharmaceutical drugs. During the course of my career, I have become familiar with information about how criminals use telephones to plan and carry out crimes, communicate with coconspirators, dispose of evidence, and escape prosecution. I am familiar with how drug dealers and drug users use telephones to arrange meetings and sales of controlled substances, as well as to coordinate the planning and execution of other types of crimes including identity theft.

11. In the course of my duties, I have been a case agent directing drug-related investigations. I have participated in many aspects of criminal investigations including reviewing evidence, conducting physical and electronic surveillance, and executing search and arrest warrants. I have interviewed defendants and witnesses while conducting various investigations. I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers.

12. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics traffickers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics trafficking generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, and phone numbers of co-conspirators. Further, because people engaged in narcotics trafficking rely on cellular telephones, location information about their phones generates evidence as well, such as information showing where and when they met and locations relevant to their activity.

13. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit that drug traffickers rely on cellular telephones because they are integral to their trafficking activity. For example, drug traffickers will use cellular telephones for the following reasons:

a. Drug traffickers and their co-conspirators will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b. Drug traffickers and their co-conspirators will use cellular telephones because they are able to communicate about the movement of drugs, such as when a source of supply is bringing drugs for them, when they are bringing drugs to a co-conspirator.

c. Drug traffickers and their co-conspirators will use cellular telephones because they are able to use them to arrange the acquisition of drugs from sources of supply, and can arrange transactions with purchasers,

d. Drug traffickers and their co-conspirators will use cellular telephones because they are able to use them to manage the movement of related funds, such as funds that are the proceeds of their activity and funds used to pay for drugs.

e. Drug traffickers and their co-conspirators will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units.

14. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that Apple cell phones are equipped to backup data to a cloud storage system associated with a user's iCloud account. When data is absent from an Apple cell phone's local hard drive because of deletion, that data can often still be maintained and is retrievable from the cloud storage system. By default, Apple cell phones back up message data to the cloud storage system.

15. The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation. Dates, times, and amounts are approximate.

**FACTS SUPPORTING PROBABLE CAUSE**

16. This affidavit seeks authority to search the Target Account, an iCloud account associated with Sarah FUZZELL, the victim of an overdose death in November 2020, where it is suspected that defendant Cole SALAZAR — presently under indictment in case

21-CR-3518-CAB on various charges including distribution of fentanyl resulting in death, possession with intent to distribute fentanyl, heroin and methamphetamine, and conspiracy to distribute fentanyl, communicated with FUZZELL to arrange and facilitate drug transactions.

17. On November 7, 2020, at approximately 1:45 p.m., San Diego County Sheriff's Department (SDSD) Deputies responded to a report of an unresponsive female inside of her apartment in Vista, California. Deputies arrived at the residence and a few minutes later pronounced FUZZELL (a twenty-four year old woman) deceased. Deputies interviewed the reporting party who stated he was FUZZELL's neighbor and that he last saw FUZZELL on November 3, 2020. The reporting party was contacted by FUZZELL's father on November 7, 2020, who asked the reporting party to check on FUZZELL, which resulted in the reporting party discovering FUZZELL unresponsive in her bed and calling 9-1-1.

18. In the apartment, SDSD Deputies found an assortment of prescribed medications, numerous alcohol containers, a bong, burnt foil, and two small clear plastic baggies with nothing inside of them. The burnt foil and a baggie presumptively tested positive for the presence of fentanyl. The San Diego County Medical Examiner's Office (MEO) conducted their own investigation and performed an autopsy on November 8, 2020. The MEO determined FUZZELL died as the result of the toxic effects of fentanyl and alprazolam.

19. Among FUZZELL's possessions in her apartment when she was found deceased was an Apple iPhone. That Apple iPhone was recovered by FUZZELL's father and was given to Team 10. FUZZELL's father told Team 10 that the Apple iPhone belonged to FUZZELL and that he believed the phone contained possible elicit communications with unknown narcotics dealers. After obtaining consent to search the Apple iPhone from FUZZELL's father, Team 10 reviewed the Apple iPhone and, based on data stored on the

phone, observed that it was associated with the Target Account.

20. Team 10 began an investigation into the death of FUZZELL to determine from whom FUZZELL procured the fatal dose of drugs. Based on a review of FUZZELL's Apple iPhone, investigators learned that FUZZELL initially communicated with SALAZAR in early August 2020 via the "LetGo" app, now owned by "OfferUp." FUZZELL communicated by email with "dabbintartar@gmail.com" (believed to be utilized by SALAZAR) using subject line "Roofing Tar." Drug dealers often use coded language, such as "roofing tar" meaning black tar heroin, in an attempt to avoid scrutiny by law enforcement.

21. Team 10 investigators obtained a forensic download of FUZZELL's cell phone. In reviewing FUZZELL's phone download, Team 10 investigators reviewed subsequent text communications between FUZZELL and SALAZAR. SALAZAR was using "TextNow" for his phone service with a telephone number ending in digits 0463 from at least October 5, 2020 through November 3, 2020. Based on the continuing messages between FUZZELL and SALAZAR, it appears as though SALAZAR was supplying fentanyl and/or heroin to FUZZELL throughout that time period, until the final transaction between them on November 3, 2020, which resulted in FUZZELL's death.

22. In particular, FUZZELL last communicated with SALAZAR on November 3, 2020 by text message. During a series of messages on November 3, 2020, SALAZAR asked FUZZELL if she knew anyone with money because he had "real blue roxi 30s." "Roxi 30s," also known as Roxicodone 30 mg tablets, or oxycodone 30 mg tablets, are commonly abused Schedule II opioid pharmaceutical pills, and counterfeits of these pills often contain fentanyl instead of oxycodone and are referred to as "blues," "Roxies," "M30s," etc. Later in the conversation, FUZZELL indicated to SALAZAR that she was dope-sick and needed drugs. SALAZAR asked FUZZELL, "u are talking the tickets to Fenway park the Fairy dust." FUZZELL replied, "Yes I'd much prefer Fenway park But

I'm desperate so." Investigators believe that "Fenway park" and "fairy dust" are references to fentanyl powder. FUZZELL and SALAZAR discussed a location to meet in the Rancho Bernardo neighborhood of San Diego. SALAZAR followed up by sending two "selfie" photographs of himself to FUZZELL

23. That same day, FUZZELL continued to send text messages to SALAZAR and confirmed they were meeting up at a parking lot in Rancho Bernardo. At approximately 10:55 a.m., FUZZELL messaged SALAZAR, "You there?" At approximately 11:11 a.m., FUZZELL messaged SALAZAR, "If u ever free and in north county come thru and kick it with me at my place." Based on these messages, investigators believe that SALAZAR and FUZZELL met on November 3, 2020 between 10:55 a.m. and 11:11 a.m. to consummate the drug transaction. FUZZELL sent her last message to SALAZAR at 11:27 a.m.

24. On January 10, 2021, an investigator acting in an undercover (UC) capacity and utilizing the decedent's (FUZZELL) cell phone, sent a text message to SALAZAR requesting "tickets to Fenway." Over the next two days, the UC and SALAZAR exchanged text messages about meeting for the UC to purchase fentanyl and heroin from SALAZAR.

25. On January 13, 2021, the UC messaged SALAZAR asking if he was available and had the "confetti," a common slang term for fentanyl. SALAZAR responded "Yes," and requested the UC meet him downtown to purchase the drugs. The UC messaged SALAZAR that she parked her car. Law enforcement observed SALAZAR walking on foot with a female (later identified as Valerie Lynn ADDISON) towards the UC's vehicle. As SALAZAR and ADDISON approached, law enforcement contacted them. SALAZAR confirmed his identity to law enforcement. A search of SALAZAR's person produced approximately 2.6 net grams of black tar heroin, a black substance containing approximately .48 grams of heroin, and a white powdery substance containing approximately .29 grams of fentanyl.

26. ADDISON told investigators that she was SALAZAR's girlfriend, and that

they were walking so that SALAZAR could sell drugs. ADDISON explained that they were staying in a hotel in her name because SALAZAR had a warrant. ADDISON told investigators that she was to receive the proceeds from SALAZAR's drug transaction. ADDISON gave law enforcement verbal and written consent to search the hotel room.

27. Investigators performed a consensual search of the hotel room. Inside the hotel room investigators found numerous controlled substances, including the following:

- Three large baggies of crystalline substance, containing approximately 60 grams of methamphetamine (actual), located in the top drawer of a night stand on the left side of the bed next to used foils and two digital scales;
- One small chunk of a white powdery substance, which presumptively tested positive for fentanyl, on top of a functional digital scale located in the top drawer of a night stand on the left side of the bed;
- A white powdery substance inside a piece of aluminum foil packaged within a folded white piece of paper on the TV stand, containing approximately 0.9 grams of cocaine hydrochloride; and
- "Pay Owe" labels and price list for drugs.

28. Items in both SALAZAR and ADDISON's names, along with male and female type clothing were found within the room.

29. During a post-Miranda interview, ADDISON admitted she was renting the room at the hotel in her name because SALAZAR had an active felony warrant. ADDISON said SALAZAR was going to sell the drugs he was in possession of to a female friend. ADDISON said SALAZAR was supposed to give her the money from the drug sales, and she was going to deposit the money into her bank account and use the money to continue renting the hotel room. ADDISON said she met SALAZAR a few years ago and he was her drug dealer. ADDISON said she and SALAZAR have been in a dating relationship for

a few months.

30. As a result of the foregoing, ADDISON and SALAZAR were booked into the custody of the San Diego County Sheriff's Department.

31. At the time of arrest, SALAZAR had a purple Galaxy S9+ cell phone in his hand. ADDISON claimed it was her phone that she allowed SALAZAR to use for the past three days. The "TextNow" app on the phone showed the associated phone number ending in digits 0463, which is the phone number the UC used to communicate with SALAZAR, and the number FUZZELL contacted to purchase drugs before her death. Over 15 messages on the phone related to the coordination with customers to sell drugs to them.

32. Investigators found numerous photographs of evidentiary value saved in this phone including the following: a photograph of a "Ziploc" style baggie containing a white powdery substance; photographs of foil with burnt residue and photographs of pills; photographs of ADDISON and SALAZAR together; screenshots of text messages regarding drug sales and directing the buyer to send payment through Venmo; and a photograph of a receipt from a hotel in ADDISON's name for two guests for the night of October 28, 2020.

33. During a post-Miranda interview with SALAZAR, SALAZAR said the drugs in the hotel room belonged to him. SALAZAR said ADDISON was renting the room, and they were both staying in the room. SALAZAR stated he had been using the purple Samsung Galaxy S9+ cell phone found in his possession for weeks. SALAZAR said he was walking to sell drugs to his friend when he was contacted and arrested by police. In regards to the investigation of the death of FUZZELL, SALAZAR denied selling FUZZELL fentanyl.

34. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics

trafficking activities of SALAZAR are likely to be found in a search of the Target Account. More precisely, given the nature of the relationships that FUZZELL had with SALAZAR, I believe a search of the Target Account is likely to reveal information about their activity, such as communications SALAZAR had with FUZZELL and statements tending to reveal the nature of SALAZAR's activity.

35. In light of the information described in this affidavit, I believe there is a basis to believe FUZZELL was messaging SALAZAR in August 2020 using her Apple cellular phone, with data storage on her iCloud account, and that there is a basis to believe she had an ongoing customer – drug dealer relationship with SALAZAR for months. Given this understanding, I seek authority to search the Target Account for the time period of June 1, 2020 through January 13, 2021 (the day of SALAZAR's arrest).

**INFORMATION REGARDING APPLE ID AND ICLOUD**

36. Apple (the "Provider") provides electronic communication services and remote computing services to its subscribers. Providers like Apple commonly ask subscribers to select a username or ID and to provide personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, email addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain transactional information about the creation and use of each account. This information can include the date on which the account was created, the length of service, records of log-in and session times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of and connections to the account. In addition, providers often have records of the IP address used to register the account and the IP addresses associated with logins to the account. Because

every device that connects to the Internet uses an IP address, IP address information can help to identify which computers or other devices were used to access an account.

37. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and

presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

f. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

38. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

39. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple

to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

40. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

41. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

42. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's

iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

43. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

44. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled

the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

45. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

46. In some cases, a subscriber or user will communicate directly with a Provider about issues relating to a website or account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the company's support services, as well well records of any actions taken by the company or user as a result of the communications.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED**

47. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The

personnel of Apple are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Apple for the relevant accounts and then to analyze the contents of those accounts on the premises of Apple. The impact on Apple's business would be severe.

48. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Target Account, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Apple, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Apple to make a digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Section II of Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

49. Analyzing the data to be provided by Apple requires special technical skills, equipment and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers

increases, the time it takes to properly analyze recovered data increases dramatically. The Internet Service Provider ("ISP") does not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

50. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

51. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic messages/comments/entries that identify any users of the subject account(s) and any electronic communications sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

52. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**PRIOR ATTEMPTS TO OBTAIN DATA**

53. Investigators have obtained consent to search the current physical Apple iPhone associated with the Target Account, which was provided from FUZZELL's father. FUZZELL's sister informed law enforcement that there were additional text messages between FUZZELL and SALAZAR stored on FUZZELL's messaging application on her Apple MacBook laptop, which shared the same Apple iCloud ID as FUZZELL's Apple iPhone. Investigators have preserved the Target Account from Apple. From my training

and experience, I understand electronic communications providers will preserve accounts. I believe that not all the relevant data and messages between SALAZAR and FUZZELL were obtained from the Apple iPhone download and may be contained in FUZZELL's iCloud account. Therefore, I am applying for this warrant to search the iCloud account associated with FUZZELL's iPhone and MacBook laptop.

54. Based on my training and experience, I am aware that certain information can be backed up to an individual's iCloud account that may not be present on the iPhone itself. This could include images backed up to iCloud due to space constraints of the actual iPhone, or backups of certain messages, emails, or other communications. In any event, at this time it is unknown if agents will be able to conduct a more comprehensive search of FUZZELL's iPhone due to technical limitations. Moreover, searches of the iPhone to date have not yielded all of the information that I believe exists on the iCloud account. Some of the information contained on the actual iPhone may coincide with information on the iCloud account. Beyond that, the United States has not attempted to obtain this data by other means.

**CONCLUSION**

55. Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a), 841(b), and 846, Distribution of Fentanyl Resulting in Death, Possession with Intent to Distribute Fentanyl, Heroin and Methamphetamine, and Conspiracy to Distribute Fentanyl, and will be found in the Target Account at Apple, Inc. to be searched as provided in Attachment A.

JACOB WISLER

Task Force Officer
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 21st day of January, 2022.

HONORABLE DANIEL E. BUTCHER
United States Magistrate Judge

# ATTACHMENT A

## Property to Be Searched

Apple, Inc. is an Internet Service Provider ("ISP") with its primary computer information systems and other electronic communications and storage systems, records and data located at One Apple Park Way, M/S 169-5CLP, Cupertino, California 95014.

Apple, Inc. hosts the following electronic communication accounts that are the subject of this search warrant and application:

Account ID: poostkd87@aol.com
Account Holder: Sarah FUZZELL
Account Number: (760) 402-1142
("Target Account")

# ATTACHMENT B

## I. Service of Warrant

The officer executing the warrant shall permit Apple, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II. Information to be disclosed by Apple, Inc.

All subscriber and/or user information and content, all electronic mail, images, text messages, histories, phone and VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, phone and FaceTime call logs, SMS & iMessages, third party application data, keybag and FileInfoList.txt files, and iCloud device backup data, and any other files or records associated with the following account:

Account ID: poostkd87@aol.com
Account Holder: Sarah FUZZELL
Account Number: (760) 402-1142
("Target Account")

## III. Information to be seized by the Government

The search of the data supplied by Apple, Inc. pursuant to this warrant will be conducted by federal investigators as provided in the "Procedures for Electronically Stored Information to be Searched and Items to be Seized" section of the affidavit submitted in support of this search warrant and will be limited to June 1, 2020 through January 13, 2021 and to the seizure of communications, records, and attachments:

a. tending to indicate efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

b. tending to identify other facilities, storage devices, or services – such as e-mail addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

d. tending to identify travel to or presence at locations involved in efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

e. tending to identify the user of, or persons with control over or access to, the Target Account;

f. tending to identify means and sources of payment for services (including any credit card or bank account numbers or digital money transfer account information); or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above;

which are evidence of violations of Title 21, United States Code, Sections 841 and 846.